The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the plaintiff and the defendant.
3. The date of the alleged injury is 4 February 1997.
4. The defendant denied the plaintiff medical treatment and benefits.
***********
Based upon the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. The plaintiff, age 29, was diagnosed and treated for a malignant tumor in the distal femur of his left leg when he was sixteen years old. After a course of chemotherapy, Dr. John M. Harrelson at Duke University Medical Center performed surgery in 1986 in which he removed the plaintiff's left distal femur, fused the plaintiff's knee joint and placed a metal rod from the plaintiff's hip to the lower end of his tibia. The plaintiff was left with an immobile left knee, such that the knee joint was fixed in an extended position and he could not bend his left leg. At the time the rod was installed, Dr. Harrelson anticipated that it would last a lifetime without the need for replacement or removal.
2. The plaintiff was in an automobile accident in November of 1987. The plaintiff's left leg impacted with the floorboard of the car and caused the rod in his leg to bend. He was required to undergo additional surgery to insert a new rod.
3. After that, the plaintiff continued to follow up with the doctors at Duke on a routine annual basis until 1993 or 1994. His leg seemed to be functioning well and he was under no physical restrictions from his doctors. He had occasional pains in the left leg, ankle and shin, but lead a relatively active life, playing with his son, swimming some and playing basketball about twice a year. After 1994, the plaintiff received no medical evaluation or treatment of his left leg until February 1997.
4. In 1994, the plaintiff graduated from college with a B.A. degree in sociology. In August of 1996, the plaintiff began working for the defendant as a behavioral modification technician at J.H. Gunn Elementary School. His duties included removing disruptive students from the classroom and creating plans to address their behavior. About once a week, the plaintiff had to physically restrain a student who was posing a threat to other students.
5. On 4 February 1997, the plaintiff was contacted on a walkie-talkie by a teacher, Mr. Dwayne Roberts, who indicated that there was a fifth grade student in his class who was throwing books. When the plaintiff arrived in the classroom, which was housed in a trailer, the teacher was restraining the student who was screaming, yelling, crying and kicking. The plaintiff then got the student in a therapeutic hold and took him outside of the doorway of the trailer onto the small balcony. The student was kicking, and as the plaintiff was attempting to take the student down the steps leading from the balcony, the plaintiff's left foot slipped to the first step and the plaintiff almost fell. The plaintiff's left foot landed with a hard impact on the step and the plaintiff's ankle and shin twisted. The plaintiff felt a "jolt" and a little tingling sensation in his left leg, and Mr. Roberts observed the plaintiff grimace.
6. The plaintiff took the student to the "time-out" area and got him calmed down. His left leg hurt and tingled a little, but the plaintiff did not "really pay attention to that." However, over the next couple of days, the pain in his left leg increased and on Thursday, 6 February 1997, as he was walking down the hallway at school, the plaintiff began to experience excruciating pain in his left tibia area. The school was closed that Friday and the following Monday, 11 February 1997. By Tuesday, 12 February 1997, the pain was so bad that the plaintiff could hardly walk. He called the school secretary that morning and told her he was going to the doctor. The plaintiff reported the 4 February 1997 incident to the principal that day, after he saw the doctor.
7. On 11 February 1997, the plaintiff saw Dr. Avinash Shah at Presbyterian Hospital. Dr. Shah took an x-ray which revealed some mild lucency about the distal aspect of the tibial rod, suggesting the possibility of mild motion at that site. There was no evidence of a fracture. Dr. Shah prescribed medication and gave the plaintiff a note to be out of work until a return appointment on 18 February 1997. The plaintiff returned to Dr. Shah on 18 February 1997, at which time Dr. Shah gave him a note to return to work on 28 February 1997 and recommended an MRI. An MRI of the left lower extremity on 20 February 1997 was negative for a stress fracture.
8. The plaintiff was referred to Dr. Robert B. McBride at Charlotte Orthopaedic Specialists. On 6 March 1997, Dr. McBride reviewed x-rays of the tibia and concluded that there was a loosening of the rod. Dr. McBride was concerned about the risk of a fracture of the left tibia and recommended a tibial brace to support the leg. Dr. McBride suggested the plaintiff return to Dr. Harrelson at Duke, and took the plaintiff out of work until he could be evaluated by Dr. Harrelson.
9. The plaintiff could not get an appointment with Dr. Harrelson, and so on 19 March 1997, the plaintiff saw Dr. McBride's partner, Dr. E. James Sebold. Dr. Sebold repeated x-rays of the plaintiff's left leg, compared them to x-rays and the MRI from February 1997, and also compared them to x-rays taken in 1993 during a prior visit to Charlotte Orthopaedic Specialists. Dr. Sebold noted no obvious areas for potential stress fracture. He also noted that the lucency present in the recent x-rays was also present in the 1993 x-ray, indicating that the evidence of mild motion of the rod was present for three to four years. This was a normal expected finding for a rod of the type installed. A bone scan showed increased activity at the end of the rod and at the fusion on the knee. However, Dr. Sebold could find no obvious reason for the amount of discomfort the plaintiff was having. Dr. Sebold encouraged the plaintiff to return to Dr. Harrelson at Duke because Dr. Harrelson was more familiar with the plaintiff's history. The plaintiff returned to Dr. Sebold on 27 March 1997. Dr. Sebold put the plaintiff in a cast and encouraged him to "give it time." He took the plaintiff out of work four more weeks. The plaintiff returned to Dr. Sebold again on 24 April 1997 and 13 June 1997, at which time he determined there was no other treatment he could provide to help the plaintiff. He authorized the plaintiff to be out of work another four weeks.
10. Meanwhile, the plaintiff had spoken with someone in the human resources office of the defendant about finding a light duty job. When the defendant did not offer a suitable job, the plaintiff tendered his resignation. On 12 May 1997, the plaintiff began working at First Data Corporation as a customer service representative, which job the plaintiff could primarily perform seated. At the time of the hearing, he was making an average weekly wage of approximately the same or better than his pre-injury average weekly wage of $407.48.
11. The plaintiff last saw Dr. Sebold on 13 June 1997. Dr. Sebold advised against removing the rod and could offer the plaintiff no other treatment and released him to return as needed.
12. Dr. Harrelson at Duke evaluated the plaintiff on 1 July 1997 and recommended surgery to remove the rod. The surgery was performed on 14 July 1997. The plaintiff experienced almost immediate relief of the pain at the end of the tibia and did well for approximately two months. However, the plaintiff then began to develop pain at the knee joint level, which was determined to be caused by a stress fracture at that level which resulted from the surgery. At the time of Dr. Harrelson's deposition of 12 March 1998, the plaintiff's knee was healing.
13. Since the insertion of the rod, the plaintiff's leg was more vulnerable than a normal leg. The movement of the rod within the leg, as shown by the lucency in MRI, is due to the relative differences in the elasticity of the bone and the rod, along with the normal everyday stresses from walking on that leg for over ten years.
14. Dr. Sebold, an orthopaedic surgeon, who has been practicing medicine approximately five years and treated the plaintiff on a limited basis, testified that it is possible, but not likely, that there is a causal relationship between the 4 February 1997 incident and the condition for which he treated the plaintiff. He did state, however, that it is entirely possible and that he has no way of knowing whether the incident aggravated the existing stress reaction on the lower end of the tibia.
15. Dr. Harrelson is board-certified in orthopaedic surgery and pathology, and has been on the faculty of both of those departments at Duke University Medical School since 1973. Based upon Dr. Harrelson's education and experience, his deposition testimony, and the credible testimony of the plaintiff, the undersigned finds that although the movement of the rod was a natural occurrence over time, the 4 February 1997 incident aggravated the plaintiff's leg condition, causing it to become painful at its distal end. This pain could not be resolved by conservative means and resulted in the necessity for the surgery to remove the rod.
16. The plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant on 4 February 1997 which resulted in an aggravation of his pre-existing left leg condition and ultimately resulted in the need for surgery to remove the rod in the plaintiff's leg, a left knee stress fracture and follow-up treatment.
17. As a result of the injury by accident, the plaintiff was unable to earn wages with the defendant or in any employment from 11 February 1997 until 12 May 1997.
***********
Based on the foregoing Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant on 4 February 1997 which caused an aggravation of the plaintiff's pre-existing left leg condition. N.C.G.S. § 97-2(6).
2. As a result of the 4 February 1997 injury by accident, the plaintiff was temporarily and totally disabled from 11 February 1997 until 12 May 1997 and is entitled to compensation at the weekly rate of $271.67 for that period of time. N.C.G.S. § 97-29. He is additionally entitled to temporary total disability compensation for any time he was unable to earn wages following his July 1997 surgery. N.C.G.S. § 97-29.
3. The plaintiff is entitled to have the defendant provide all medical compensation necessitated by the 4 February 1997 injury by accident, including treatment relating to the stress fracture that developed in his knee area after the July 1997 surgery. N.C.G.S. § 97-25.
***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. The defendant shall pay temporary total disability compensation to the plaintiff at the rate of $271.67 for the period of time from 11 February 1997 until 12 May 1997 and for any subsequent periods of total disability resulting from the injury by accident upon which the parties can agree. If the parties cannot agree, either party may request a hearing on the issue, preferably after the plaintiff reaches maximum medical improvement. The part of this amount that has accrued shall be paid to the plaintiff in a lump sum subject to the attorney fee hereinafter approved.
2. The defendant shall pay all medical compensation necessitated by the injury by accident.
3. An attorney fee in the amount of twenty-five percent is approved for the plaintiff's attorney, to be deducted from the amount due the plaintiff by the defendant and paid directly to the plaintiff's attorney.
4. The defendant shall pay the costs.
5. Plaintiff's motion for attorney's fees is denied.
This the ___ day of September 1999.
S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
DCS/bjp